1

MINA HAKAKIAN (SBN 237666)
**HAKAKIAN WILLIAMS LAW GROUP PC**
1541 Westwood Blvd., Second Floor
Los Angeles, California 90024
Tel.: (310) 982-2733
Email: mhakakian@hwlgpc.com

2

3

4

5

*Attorneys for Plaintiff,*
VYTAL SURGICAL INSTITUTE, INC.

6

7

**UNITED STATES DISTRICT COURT**

8

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| VYTAL SURGICAL INSTITUTE, INC., a California Corporation | Case No. 2:25-cv-5922 |
| *Plaintiffs,* | |
| v. | **COMPLAINT FOR RECOVERY OF BENEFITS UNDER 29 U.S.C. § 1132(A)(1)(B), BREACH OF FIDUCIARY DUTIES UNDER 29 U.S.C. § 1132(A)(3), AND REASONABLE ATTORNEY'S FEES AND COSTS UNDER 29 U.S.C. § 1132(G)(1)** |
| BLUE CROSS AND BLUE SHIELD OF TEXAS; CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD OF CALIFORNIA; and CBRE, INC. | |
| *Defendants.* | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -
Complaint

Plaintiff, Vytal Surgical Institute, Inc., a California corporation, (herein referred to as "Plaintiff" or "Vytal"), alleges against Defendant Blue Cross and Blue Shield of Texas, a division of Health Care Service Corporation, mutual legal reserve company ("BCBSTX"), Defendant California Physicians' Service d/b/a Blue Shield of California ("BSC"), and Defendant CBRE, Inc. ("CBRE") (collectively "Defendants") as follows:

**I. INTRODUCTION**

Plaintiff Vytal, an out-of-network surgical institute which received a valid assignment of benefits, brings this action to recover unpaid benefits and obtain relief for fiduciary breaches under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff seeks redress for two distinct ERISA violations which caused harm: (1) improper denial and underpayment of benefits; and (2) breaches of fiduciary duties arising from Defendants' administration, repricing, and mishandling of claims for a patient's services.

The patient's ERISA Plan was sponsored and administered by CBRE through the Blue Cross Blue Shield Association ("BCBSA")'s BlueCard® Program, with BCBSTX serving as the "home plan" and BSC acting as the "host plan" for services rendered in California. Before providing care, Vytal contacted BSC through the designated BlueCard® provider verification line. BSC confirmed coverage and medical necessity, approved specific Current Procedural

Terminology ("CPT") codes, and represented 60% Maximum Reimbursable Charge reimbursement, stating it was reading directly from the Plan. BCBSTX later issued a formal preapproval letter confirming coverage and authorizing those same CPT codes. After surgery, Vytal submitted claims for covered services to BSC. BSC then issued an Explanation of Benefits ("EOB") that omitted authorized CPT codes, applied unexplained pricing reductions, and failed to cite Plan terms or reimbursement methodology. Despite its limited role under the BlueCard® Program, BSC exercised discretionary control over benefit determinations and pricing. BCBSTX adopted the underpayment and failed to correct or oversee BSC's determinations. Each Defendant thereby violated ERISA §§ 502(a)(1)(B) and 502(a)(3) by improperly denying benefits, breaching fiduciary duties, and depriving Plaintiff of full and fair review.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), because the action seeks to enforce rights guaranteed under ERISA.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District, including verification and

preauthorization communications, provision of services, and claim submissions originating from within this District.

3. Personal jurisdiction and venue are further proper because each Defendant, CBRE, BCBSTX, and BSC, conducts substantial business within the Central District of California. CBRE maintains offices and employee benefits operations in Los Angeles and Orange Counties. BCBSTX processes out-of-state ERISA claims through the BlueCard® Program for services rendered in this District and conducts ongoing claims administration for members receiving care in California.  BSC is a California-licensed health care service plan under the Knox-Keene Act (Cal. Health & Safety Code § 1340 et seq).and regularly administers and adjudicates claims in this District. Each Defendant purposefully directed activities toward this forum and participated in the events giving rise to the claims alleged herein.

4. Although BSC is licensed under the Knox-Keene Act, Plaintiff's claims arise under ERISA because BSC acted as a functional fiduciary with respect to a self-funded ERISA plan. ERISA governs these claims and preempts any overlapping state-law obligations.[1]

///

///

---

[1] See 29 U.S.C. § 1144(a); Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004).

## III. PARTIES

## A. Plaintiff

5. Plaintiff Vytal is a California corporation, duly organized and existing under the laws of the State of California, with its principal place of business in Los Angeles County, California.

6. Plaintiff operates a surgical center in Tarzana, California, equipped with advanced medical technology and staffed by experienced professionals. The facility provides comprehensive outpatient surgical care in a modern, specialized setting. Vytal performs procedures including orthopedic, spine, ENT, nasal, gastrointestinal, and general surgeries, serving patients insured under ERISA group health benefit plans. Many of Vytal's patients seek care on an out-of-network basis after verifying coverage and plan benefits with their insurance administrators.

7. In this case, a patient referred to as Patient GIN-SHO[2] sought care at Vytal. Prior to providing services, Vytal verified active coverage under the CBRE, Inc. self-funded ERISA group health benefit plan, identified on the patient's insurance card as BlueEdge PPO and administered through the BCBSA's BlueCard® Program. A true and correct copy of Patient GIN-SHO's insurance card is attached as *Exhibit 1*.

---

[2] To protect patient privacy, identifying information has been omitted. Plaintiff will disclose the patient's identity pursuant to a Protective Order and applicable privacy laws.

8. Before rendering services, Vytal also obtained a valid and enforceable assignment of benefits from the patient, which conveyed to Vytal all applicable ERISA rights, including but not limited to the right to receive benefits, assert fiduciary claims, pursue appeals, and bring suit under 29 U.S.C. § 1132 as the patient's assignee. A true and correct copy of Patient GIN-SHO's executed Assignment of Benefits ("AOB") is attached as *Exhibit 2*.

**B. Defendants**

9. Plaintiff is informed and believes, based on plan verification records, insurance identification card information, pre-service verification calls, claim submission records, and Defendants' representations, that each Defendant identified below performed plan administration functions relevant to the claims at issue.

**1. CBRE, Inc.**

10. CBRE is a Delaware corporation with its principal place of business in Texas. CBRE, Inc. is the employer and plan sponsor of the self-funded ERISA group health benefit plan at issue. It established, funded, and administered the Plan for the benefit of its employees, including Patient GIN-SHO. As the Plan sponsor and a named fiduciary, CBRE exercised authority and control over the establishment, maintenance, and funding of the Plan, and owed fiduciary duties under ERISA with respect to plan administration and plan assets.

**2. Blue Cross and Blue Shield of Texas, a division of Health Care Service Corporation, a mutual legal reserve company**

11. BCBSTX is a division of Health Care Service Corporation ("HCSC"), a mutual legal reserve company organized under the laws of the State of Texas, with its principal place of business in Illinois. HCSC is an independent licensee of the BCBSA and operates Blue-branded plans in Texas and other states. BCBSTX is responsible for administering ERISA claims in Texas and for serving as the "home plan" when its members receive out-of-state care as part of HCSC's participation in the BlueCard® Program.

12. The BlueCard® Program is a nationwide claims system operated by the BCBSA which facilitates inter-plan coordination for out-of-state medical services.[3] It contractually separates responsibilities between the home plan, which administers the member's ERISA coverage, and the host plan, which handles local claim intake and pricing.[4] The home plan is responsible for eligibility, utilization review, and benefit determinations, while the host plan applies local provider rates and transmits claims.

13. This role division, codified in BlueCard® materials, facilitates lawful fiduciary delegation and prevents unauthorized entities from exercising

---

[3] *BlueCard Program Provider Manual*, Blue Cross Blue Shield Ass'n, at 4-6 (2023), https://provider.bcbs.com (last visited June 12, 2025).
[4] *Id.* at 5.

discretionary control. The separation is not merely administrative, it is essential to preserving transparency, accountability, and enforceable rights under ERISA. When host plans exceed their limited role, or home plans abdicate their obligations, the breakdown obscures who made the benefit determination, impedes oversight of delegated authority, and undermines the participant's ability to appeal or build an adequate administrative record. This violates ERISA's fiduciary structure by enabling unauthorized discretion without lawful delegation and by weakening the home plan's duty to independently exercise and monitor fiduciary authority.[5]

14. BCBSTX served as the "home plan" administering CBRE's self-funded ERISA group health benefit plan under the BlueCard® Program. As the home plan, BCBSTX was delegated authority to determine eligibility, calculate benefits, conduct utilization review, process claims, apply pricing methodologies, and administer plan benefits for services rendered both in-state and out-of-state. In performing these functions, BCBSTX exercised discretionary authority and acted as an ERISA fiduciary under 29 U.S.C. § 1002(21)(A). As the designated

---

[5] See 29 U.S.C. §§ 1104(a)(1), 1105(c); *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 891 (9th Cir. 2019) ("Delegation of fiduciary duties under ERISA must be made in accordance with the plan document and monitored adequately."); *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (fiduciaries must monitor delegated functions); *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 972–74 (9th Cir. 2006) (de novo review may apply where procedural irregularities taint the claim process).

Complaint

fiduciary, BCBSTX was required to retain control over benefit determinations and ensure that claims were adjudicated in accordance with the terms of the ERISA-governed Plan. It was not permitted to delegate discretionary authority to the host plan except as expressly authorized by the Plan and was required to independently evaluate claims and monitor any delegated functions in accordance with its fiduciary obligations under ERISA.

**3. California Physicians' Service d/b/a Blue Shield of California.**

15. BSC, a nonprofit health plan licensed under the Knox-Keene Health Care Service Plan Act and independent licensee of the BCBSA, served as the "host plan" under the BlueCard® Program for services rendered in California. As host plan, BSC was responsible for receiving claims, applying its local provider contract rates, and forwarding clean claims to the home plan for adjudication. Host plans are generally limited to ministerial functions and do not serve as ERISA fiduciaries unless they exercise discretionary authority over benefit determinations. Under BlueCard® Program rules, the host plan is responsible for receiving claims, applying provider contract pricing, forwarding clean claims to the home plan, and issuing payments according to national BlueCard® policies.[6] Host plans are required to "accept and accurately price all claims received … in accordance with

---

[6] *See id.* at 6-9.

their provider contracts and Inter-Plan Programs policy requirements."[7] In performing these functions, BSC exercised discretionary authority over claim pricing, processing, and payment determinations, and acted as an ERISA fiduciary with respect to the claims at issue.

## IV. FACTS

### A. Plaintiff Obtained an Assignment of Benefits that Conferred ERISA Standing for Claims

16. Plaintiff Vytal obtained a valid written AOB from Patient Gin-Sho prior to rendering surgical services on April 15, 2021. Through this assignment, the patient expressly transferred all relevant rights under the ERISA-governed health Plan, including the right to receive benefit payments, pursue administrative appeals, and assert legal claims for payment and fiduciary breach. This AOB conferred standing upon Plaintiff to pursue claims under ERISA §§ 502(a)(1)(B) and 502(a)(3).[8] *See Ex. 2.*

///

///

---

[7] *Id.* at 9.
[8] A provider with a valid AOB from an ERISA plan participant has standing to assert claims under both 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3). *See Metcalf v. Blue Cross Blue Shield of Mich.*, 57 F. Supp. 3d 1281, 1287 (D. Or. 2014) (holding provider had standing to simultaneously pursue both benefits and equitable relief, including for fiduciary breach, as an assignee); *accord Cal. Spine & Neurosurgery Inst. v. Carpenters Health & Welfare Tr. Fund*, No. 24-cv-04493-NW, slip op. at 4 (N.D. Cal. Apr. 11, 2025).

**B. Plaintiff Completed Insurance Verifications with Defendants, Who Had Attested to Specific Benefits Which Induced Service**

17. Prior to surgery, Patient Gin-Sho presented an insurance card identifying her ERISA self-funded group health Plan, sponsored by her employer CBRE, Inc., as a BlueEdge PPO Plan with prefix "CR9." This prefix reasonably confirmed BCBSTX as the "home plan."[9] The card instructed providers to contact BSC for eligibility and benefit verification via the listed provider services number, thereby reasonably confirming BSC's role as the designated "host plan" under the BlueCard® Program. *See Ex. 1*.

18. Consistent with Defendants' explicit instructions on Patient Gin-Sho's insurance card, industry-standard protocols, and Vytal's routine practice, Vytal contacted BSC to verify eligibility and out-of-network benefit terms on two separate occasions: February 26, 2021, and April 14, 2021. Vytal routinely documents such insurance verification communications at or near the time they occur as part of its standard intake and billing procedures.  A true and correct copy

---

[9] "The three-character prefix at the beginning of the member's identification number is the key element used to identify and correctly route out-of-state claims to the appropriate BCBS Plan." The prefix specifically "identifies the Blue Cross and Blue Shield Plan to which the member belongs."
*See Blue Cross & Blue Shield of Tex., Understanding the BlueCard Program – Prefixes*, https://www.bcbstx.com/provider/claims/claims-eligibility/bluecard-prefix (last visited June 22, 2025).

of the verification call records for Patient Gin-Sho, which were created and maintained by Vytal in the ordinary course of business are attached as *Exhibit 3*.

19. During Plaintiff's February 26, 2021 pre-verification call to Defendants' provider verification services, Plaintiff informed Defendant BSC's authorized representative of its provider and facility information, the patient's plan member identity, and the proposed CPT codes and date of service. [10] Upon Plaintiff's inquiry, BSC confirmed that it was reading directly from the applicable plan document. BSC further confirmed that out-of-network benefits were available for services rendered by Plaintiff to Patient Gin-Sho, acknowledged the applicable CPT codes—20912, 30520, 30465, and 30140 (noting that some may require pre-authorization)—and specifically represented that reimbursement would be provided at 60% of the "Maximum Reimbursable Charge" ("MRC").  However, BSC failed to disclose how the Plan's MRC was calculated or specify the reimbursement amount Plaintiff could expect, despite having sufficient information at the time to do so. *See Ex. 3*.

20. Nonetheless, Plaintiff reasonably relied on BSC's representations made during the February 26, 2021, call, including the representation that reimbursement would be provided at 60% of the MRC, in electing to render the services.

---

[10] Defendant BSC's representative identified himself only as "Shawn." Plaintiff is in possession of the call reference number, which is available upon request or pursuant to court order

21. On April 6, 2021, Defendant BCBSTX issued an Approval Letter directly to Plaintiff at its facility. BCBSTX therein stated that CPT codes 30520, 30465, and 30140 were "approved as medically necessary" for outpatient treatment at Plaintiff's facility. BCBSTX further instructed Plaintiff to call to ensure benefit coverage **if** additional services were needed or the treatment plan changed, with "IF" appearing in bold.  A true and correct copy of BCBSTX's approval letter is attached as *Exhibit 4*.

22. Plaintiff reasonably understood BCBSTX's approval letter to confirm that coverage for the approved CPT codes was in place absent any additional services or changes to the treatment plan. In reliance on BCBSTX's express written approval, Plaintiff proceeded to render the authorized services to Patient Gin-Sho. *See Ex. 4.*

23. Although Plaintiff had already confirmed benefits by phone on February 26, 2021, with BSC, and received BCBSTX's written approval letter, Plaintiff nonetheless completed an additional, and arguably unnecessary, pre-verification call to BSC on April 14, 2021, to reconfirm coverage for the proposed services. During this call, Plaintiff again provided BSC's authorized representative with its provider and facility information, the patient's plan member identity, and the

Complaint

proposed CPT codes and date of service. [11] BSC's authorized representative confirmed that they were referencing the applicable plan document, reiterated that out-of-network benefits were available for the proposed services, acknowledged the same CPT codes (20912, 30520, 30465, and 30140), and reaffirmed that reimbursement would be at 60% of the MRC. *See Ex. 4.*

24. Plaintiff also relied on the April 14, 2021, call, in which BSC's authorized representative reaffirmed the same coverage terms after Plaintiff again provided all relevant provider, patient, and procedural information. In reliance on BSC's repeated representations and continued failure to clarify the MRC calculation or expected reimbursement, Plaintiff rendered the services to Patient Gin-Sho. *See Ex. 4.*

25. Plaintiff verified eligibility and benefits in accordance with Defendants' express instructions, industry standards, and Vytal's regular practice. Defendants repeatedly confirmed out-of-network coverage and reimbursement at 60% of the MRC, verbally and in writing, while omitting the Plan's MRC calculation method, a material term affecting reimbursement. Plaintiff diligently conducted multiple verifications, including a second call just days before surgery, to reconfirm benefits and coverage, despite receiving Defendants' Approval letter. In reasonable reliance

---

[11] Defendant BSC's representative identified herself only as "Katie." Plaintiff is in possession of the call reference number, which is available upon request or pursuant to court order

of Defendants' representations, and absent any contrary explanation, Plaintiff

rendered medically necessary services to a covered ERISA plan participant. *See*

*Exs. 3 & 4.*

**C. Surgery Was Performed in Reliance on Defendants' Representations, and Plaintiff Properly Submitted the UB-04 Claim Form**

26. Patient GIN-SHO's pre-operative diagnoses were:

- Bilateral vestibular stenosis secondary to nasal valve collapse;

- Septal deviation; and

- Bilateral inferior turbinate hypertrophy,

as documented in her Operative Report, a true and correct copy of which is

attached as *Exhibit 5.*

27. After diagnosing Patient GIN-SHO, obtaining her informed consent and

valid Assignment of Benefits, and relying on Defendants' repeated assurances of

out-of-network coverage at 60% of the MRC, on April 15, 2021, Plaintiff

performed the medically necessary surgery.

28. Intraoperatively, Plaintiff confirmed severe nasal valve collapse with

associated septal deviation and proceeded to perform the following procedures:

- Repair of vestibular stenosis using intranasal spreader grafts;

- Septoplasty;

- Submucous resection of bilateral inferior turbinates; and

Complaint

- Harvest of septal cartilage.

*See Ex. 5.*

29. Following Patient GIN-SHO's surgery, Plaintiff properly submitted an industry-standard UB-04 institutional claim form (Form CMS-1450) to Defendant BSC seeking reimbursement for surgical services provided. The UB-04 claim form included all required billing, provider, procedural, and insurance information necessary to support Plaintiff's request for reimbursement and allow Defendants to process and reimburse the claim in the ordinary course. The total billed charge was $56,558.50, with CPT codes and descriptions individually listed alongside corresponding charges:

- CPT 30465 Repair Vestibular Stenosis: $34,754.85

- CPT 30520 Septoplasty: $8,017.12

- CPT 30140 Inferior Turbinate Reduction: $8,017.12

- CPT 20912 Graft Cartilage Harvest: $5,769.41

These charges reflected Plaintiff's usual, customary, and reasonable rates, consistent with those billed to non-Medicare patients insured by commercial payors other than the subject Plan. A true and correct copy of the submitted UB-04 claim form is attached as *Exhibit 6*.

30. Plaintiff indicated in Box 53 of the UB-04 claim form that it had obtained a valid Assignment of Benefits from Patient GIN-SHO authorizing direct

payment of plan benefits to Plaintiff.[12] This entry served as formal notice that Plaintiff was asserting derivative rights under the ERISA Plan as the patient's authorized assignee. As the receiving host plan under the BlueCard® Program, BSC's receipt and processing of the UB-04 placed all Defendants on notice of Plaintiff's assignee status. *See Ex. 6.*

31. Defendants accepted Plaintiff's UB-04 claim form for processing without objection to its format, completeness, or Plaintiff's assignee status. By receiving and adjudicating the claim through the standard BlueCard® claims administration process, Defendants acknowledged the validity of the submission and treated Plaintiff as the proper claimant. Defendants' acceptance and processing of the claim without challenge to Plaintiff's status as assignee is consistent with waiver of any purported anti-assignment clause. Based on this conduct, Plaintiff reasonably understood that Defendants would not dispute its standing under ERISA. *See Ex. 6.*

---

[12] Box 53 on the UB-04 claim form is the designated field used to indicate that the provider has obtained a valid Assignment of Benefits and is requesting direct payment of plan benefits. Industry-standard billing protocols and guidance from the National Uniform Billing Committee recognize this field as the formal method of notifying payers that the provider is asserting derivative rights.

**D. Defendants Improperly Repriced Covered Claims in Violation of ERISA and Issued a Materially Defective EOB**

32. On June 25, 2021, Defendants, acting through Defendant BSC, issued an EOB that unilaterally omitted previously approved CPT codes, failed to apply the represented 60% MRC rate, and cited no specific Plan terms supporting the denial or pricing reduction, as required under ERISA. A true and correct copy of Defendants' EOB is attached as *Exhibit 7*.

33. To assist the Court, Plaintiff has replicated the payment data from Defendants' EOB below and supplemented it with the corresponding CPT codes (in parentheses) from Plaintiff's UB-04 claim form, as Defendants' omission of CPT codes in their EOB hinders the ability to match billed procedures to paid amounts:

*Table 1: Clarified EOB Chart (With CPT Codes Added)*

| EOB ISSUED 06/25/21 FOR PATIENT GIN-SHO'S DATE OF SERVICE 04/15/21 | | | | | | | |
|---|---|---|---|---|---|---|---|
| PROCEDURE CODE | BILLED AMOUNT | ALLOWED AMOUNT | CONTRACTUAL ADJUSTMENT AMOUNT | NOTES | DEDUCTIBLE | CO-PAY AMOUNT | AMOUNT PAID |
| 490 (30465) | $34,754.85 | $3,828.42 | - | 2 | $0 | $1,531.38 | $2,297.06 |
| 490 (30520) | $8,017.12 | $883.12 | - | 2 | $0 | $228.92 | $654.20 |
| 490 (30140) | $8,017.12 | $883.12 | - | 2 | $0 | $0 | $883.12 |
| 490 (20912) | $5,769.41 | $0 | - | 1 | $0 | $0 | $0 |
| TOTAL | $56,558.50 | $5,594.66 | $0 | | $0 | $1,760.28 | $3,834.38 |

*See Exs. 6 & 7.*

The "Notes" column in Defendants' EOB (replicated in Table 1 above) relied solely on numeric codes (e.g., "1," "2") to justify reduced or denied

reimbursement. Defendants identified the corresponding explanations for these codes as follows:

1 – This service is not a benefit of the subscriber's health plan.

2 – Home plan pricing used.

Defendants included no further explanation or reference to plan terms on their EOB. *See Ex. 7.*

**1. Defendants Failed to Apply Promised Reimbursement Rate**

34. Defendants, through BSC, failed to apply the 60% Maximum Reimbursable Charge (MRC) rate that was expressly attested to and confirmed by BSC during both pre-verification calls. The reimbursed amounts for each CPT code fall substantially below 60% of the corresponding billed charges. *See Exs. 3 & 7.*

35. Based on BSC's pre-service representations, each plausible alternative scenario, one of which necessarily occurred, independently supports ERISA relief.

- **Truthful Representation, Underpayment Below Actual Plan Rate**: If, during the pre-verification calls, BSC accurately described the Plan as providing 60% MRC reimbursement, then Defendants' substantial underpayment shows they failed to adjudicate Plaintiff's claim according to Plan terms, in violation of 29 U.S.C. § 1132(a)(1)(B). The resulting shortfall denied Plaintiff benefits owed under the Plan,

which Plaintiff had the legal right to receive as the assignee of a covered participant.

- **False Representation, Underpayment Below Actual Plan Rate**: If, during the pre-verification calls, BSC falsely represented the applicable Plan reimbursement rate and Defendants paid less than the actual Plan rate, then Defendants violated 29 U.S.C. § 1132(a)(1)(B) by failing to pay benefits due under the terms of the Plan. Defendants' misrepresentation of a 60% MRC rate, made while exercising discretionary authority over benefit communications and payment decisions, constitutes a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Defendants' misrepresentation induced reliance and caused financial harm and reflected a failure to act with loyalty or care toward Plaintiff, who held a valid assignment of benefits from the covered participant prior to rendering services and made benefit inquiries in that capacity.

- **False Representation, Accurate Payment of Lower Plan Rate**: If the Plan provided a lower rate and Defendants accurately paid it, their repeated pre-service promises of 60% MRC induced reliance and services under false pretenses, constituting a breach of fiduciary duty under § 1132(a)(3). Plaintiff held a valid assignment of benefits from

Complaint

the covered participant before rendering services and made benefit

inquiries in that capacity. Defendants' misrepresentations, made while

exercising discretionary authority over benefit communications,

reflect a failure to act with care or loyalty toward the participant or

assignee and support the elements for equitable relief.

36. A concrete instance of Defendants' failure to honor their attested

reimbursement terms appears with CPT code 20912 (Graft Cartilage Harvest).

During both pre-verification calls, Defendants, through BSC, unequivocally

represented that this procedure was covered and reimbursable at 60% MRC. Yet

Defendants reimbursed nothing for this code, without reference to any Plan

exclusion, limitation, or alternate pricing basis. This denial is not merely

inconsistent with Defendants' prior assurances; it directly contradicts them. The

absence of justification underscores Defendants' failure to adjudicate the claim per

the represented Plan terms, supporting a claim under 29 U.S.C. § 1132(a)(1)(B). It

also independently supports a claim under § 1132(a)(3), as Defendants exercised

discretionary control, materially misrepresented coverage, induced reliance, and

breached their fiduciary duties of care and loyalty. *See Exs.3. & 7.*

///

///

///

Complaint

**2. Defendants Issued an EOB That Violated ERISA's Procedural Notice Regulations Under 29 C.F.R. § 2560.503-1(g)(1)**

37. 29 C.F.R. § 2560.503-1(g)(1) mandates **all** five specific disclosure sub-requirements that must be satisfied in any adverse benefit determination.[13] Defendants failed to meet each of these requirements when issuing their EOB. These procedural violations support a claim for improper denial of benefits under 29 U.S.C. § 1132(a)(1)(B), as they deprived Plaintiff of a meaningful opportunity to assess or challenge the denial and rendered the decision fundamentally unreliable. They also independently constitute a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3), as Defendants failed to administer the claims process with the care, loyalty, and transparency required by ERISA. *See Ex. 7.*

38. Defendants violated 29 C.F.R. § 2560.503-1(g)(1)(i), which requires that an adverse benefit determination include "the specific reason or reasons for the adverse determination." Defendants only listed the numeric denial codes "1" and "2," which were ambiguously defined as "this service is not a benefit of the

---

[13] 29 C.F.R. § 2560.503-1(g)(1) mandates benefit denials must contain: (i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) A description of the plan's review procedures and the time limits applicable to such procedures; and (v) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule or a statement that such a rule was relied upon and that a copy will be provided free of charge upon request.

subscriber's health plan" and "home plan pricing used," without linking either explanation to the specific CPT codes (which Defendants omitted entirely from their EOB) or amounts at issue. This vague coding scheme did not inform Plaintiff why coverage was denied or reduced and thus failed to satisfy the regulatory requirement for specificity.  Moreover, Defendants failed to disclose the methodology used to calculate the "Allowed Amounts" for the procedures and mischaracterized CPT 20912 as "not covered" without citing any applicable Plan exclusion, limitation, or other authority, further obstructing Plaintiff's ability to understand or contest the basis for the denial. *See Ex. 7.*

39. Defendants violated 29 C.F.R. § 2560.503-1(g)(1)(ii), which requires that an adverse benefit determination include "reference to the specific plan provisions on which the determination is based." Defendants failed to cite or identify any reimbursement formula, pricing methodology, or specific provision of the governing Plan, even in general terms, in their EOB. Defendants' omission prevented Plaintiff from understanding the basis for the denial and deprived Plaintiff of any ability to evaluate or challenge the legitimacy of Defendants' benefit determination. *See Ex. 7.*

40. Defendants violated 29 C.F.R. § 2560.503-1(g)(1)(iii), which mandates a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is

Complaint

necessary." Defendants' EOB provided no such description. It failed to identify any deficiencies in Plaintiff's claim submission, offer any guidance as to what further documentation was required, or explain why any additional information might be needed to evaluate the claim. This omission denied Plaintiff a fair opportunity to supplement the record or cure any perceived defects, as required by ERISA's procedural safeguards. *See Ex. 7*.

41. Defendants violated 29 C.F.R. § 2560.503-1(g)(1)(iv), which requires "a description of the plan's review procedures and the time limits applicable to such procedures." The EOB contained no description of the internal review or appeal process, nor did it identify the applicable timeframes for initiating a review under the ERISA Plan. This omission deprived Plaintiff of essential information needed to invoke administrative remedies and timely challenge the denial, thereby frustrating ERISA's requirement of a meaningful opportunity for full and fair review, obscuring Plaintiff's legal recourse, and rendering the benefit denial defective under ERISA. *See Ex. 7*.

42. Defendants violated 29 C.F.R. § 2560.503-1(g)(1)(v), which requires that an adverse benefit determination include "in the case of a group health plan … a statement describing any voluntary appeal procedures offered by the plan and the claimant's right to obtain information about such procedures." Defendants' EOB did not include any statement regarding the availability of voluntary appeals, nor

Complaint

did it inform Plaintiff of any right to request additional information about appeal options. This omission deprived Plaintiff of critical information necessary to evaluate next steps, thereby further compounding the procedural deficiencies and undermining ERISA's full and fair review framework. *See Ex. 7.*

**3. Defendants' EOB Reflected Fiduciary Misconduct in Violation of ERISA §§ 1102(a), 1104(a), and 1105**

43. The EOB Defendants issued to Plaintiff was not merely procedurally defective under ERISA's disclosure regulations but also reflected multiple substantive breaches of fiduciary duty by all Defendants in violation of 29 U.S.C. § 1104(a)(1). The EOB failed to apply the promised 60% MRC rate, omitted CPT procedure labels, cited no Plan provisions or pricing methodology, and offered no legitimate explanation for the drastic underpayment. These omissions collectively demonstrate a failure to exercise the care, skill, prudence, and diligence required of ERISA fiduciaries in the administration of Plan benefits. *See Ex. 7.*

44. Defendants also violated their duties of loyalty under 29 U.S.C. § 1104(a)(1)(A) by failing to act solely in the interest of the Plan participant and Plaintiff, as the duly authorized assignee. Instead, the EOB was issued based on opaque, misleading rationales that actively obstructed Plaintiff's ability to understand the benefit determination or exercise appeal rights. This conduct reflects an intent to serve cost-containment objectives rather than the interests of the beneficiary or assigned provider.

45. Plaintiff is informed and believes that Defendant CBRE, Inc., as the sponsor and named administrator of the self-funded ERISA Plan, was a fiduciary with ultimate responsibility for ensuring lawful claims adjudication. CBRE either delegated or permitted the delegation of core administrative functions to BCBSTX as Home Plan and BSC as Host Plan under the BlueCard® Program, without ensuring compliance with ERISA fiduciary standards. If CBRE retained oversight responsibility, it breached its duty by permitting issuance of a materially defective EOB. *See Ex. 7*. If CBRE delegated that authority, it failed to monitor or remedy known violations by its agents, thereby violating its obligations under 29 U.S.C. § 1105(a).

46. Plaintiff is further informed and believes that Defendant BCBSTX also served as a named or functional administrator of the Plan and exercised discretionary authority over claims administration, including issuance of the preauthorization and adoption of the EOB. As such, BCBSTX owed fiduciary duties under ERISA, including the duty to monitor and correct the conduct of BSC as its agent or delegate. Its failure to do so constitutes a breach of fiduciary duty and gives rise to co-fiduciary liability under 29 U.S.C. § 1105(a).

47. Defendant BSC expressly represented during both pre-verification calls that specific CPT codes, including CPT 20912, were covered and that reimbursement would be issued at 60% of the MRC. These representations were

not qualified as estimates or tentative host plan guidance but instead were stated as definitive Plan terms. BSC later priced the claim and issued the adverse benefit determination—including a $0 payment for CPT 20912—without citing any applicable exclusion or Plan provision. These acts reflect discretionary authority over benefit determinations and pricing, exceeding the ministerial scope typically assigned to host plans under the BlueCard® Program. In doing so, BSC became a functional fiduciary under 29 U.S.C. § 1002(21)(A).

48. As a fiduciary, whether formally designated or functionally acting, BSC was required to act with care, diligence, and loyalty in all claim communications and determinations. Its failure to apply the quoted reimbursement rate, explain the allowed amounts, or disclose governing Plan terms constitutes a breach of fiduciary duties under 29 U.S.C. § 1104(a)(1). Moreover, because BSC exercised discretion in issuing the adverse benefit determination, CBRE and BCBSTX were obligated to monitor its conduct and prevent or correct fiduciary misconduct. Their failure to do so independently gives rise to co-fiduciary liability under 29 U.S.C. § 1105(a). All Defendants either participated in, enabled, or failed to remedy conduct that resulted in the wrongful denial of benefits and associated ERISA violations. Accordingly, Plaintiff asserts claims under 29 U.S.C. § 1132(a)(3) for breach of fiduciary duty, as well as under §§ 1102(a), 1104(a), and 1105 for improper delegation and failure to oversee co-fiduciaries.

**E. Plaintiff Appealed and Defendants Failed to Provide a Full and Fair Review in Violation of 29 U.S.C. § 1133(2)**

49. Plaintiff submitted a written appeal of the adverse benefit determination, despite being deprived of the information necessary to meaningfully challenge the denial. A true and correct copy of documentation confirming Plaintiff's participation in the appeal process is attached as *Exhibit 8*. Because Defendants issued an EOB that failed to comply with ERISA's disclosure requirements, Plaintiff lacked access to the specific reasons, governing Plan provisions, and reimbursement methodology necessary to prepare an informed appeal. As a result, the appeal process was fundamentally compromised from the outset. *See Exs. 7 & 8.*

50. ERISA requires that claimants whose benefits are denied must be afforded a "full and fair review" upon appeal. See 29 U.S.C. § 1133(2). The Department of Labor's implementing regulations under 29 C.F.R. § 2560.503-1(h) impose specific procedural protections to ensure that right is honored. Defendants failed to comply with those protections after Plaintiff submitted its appeal. These failures deprived Plaintiff of the opportunity to meaningfully contest the denial and thereby violated ERISA's procedural mandates. This supports a claim for improper denial of benefits under 29 U.S.C. § 1132(a)(1)(B) and, independently, a breach of fiduciary duty under § 1132(a)(3).

51. Defendants violated 29 C.F.R. § 2560.503-1(h)(3)(iii), which requires that an appeal be reviewed in a manner that considers all issues and materials submitted and results in a reasoned, responsive explanation. Defendants failed to issue any substantive explanation that addressed Plaintiff's appeal grounds or the issues raised therein. This failure indicates that no meaningful review occurred and constitutes a procedural violation of ERISA's full and fair review requirements.

52. Defendants also failed to provide access to relevant documents—such as the governing Plan reimbursement terms or internal pricing guidelines—during the appeal process, despite those materials being essential to understand and contest the benefit denial. While the Ninth Circuit has not squarely held that such disclosures are mandatory absent a specific request, Defendants' refusal to provide such documents rendered the appeal process one-sided and deficient. This omission violated the procedural safeguards set forth in 29 C.F.R. § 2560.503-1(h)(2)(iii) and further supports claims under both § 1132(a)(1)(B) and § 1132(a)(3).

**F. Plaintiff Exhausted Administrative Remedies or, in the Alternative, Exhaustion Was Waived or Excused Due to Defendants' Procedural Violations**

53. Plaintiff timely submitted a written appeal challenging Defendants' adverse benefit determination. *See Ex. 8*. This appeal satisfied the administrative exhaustion requirement applicable to ERISA claims.

Complaint

54. In the alternative, any further obligation to exhaust administrative remedies is excused because Defendants failed to comply with ERISA's mandatory procedural safeguards. Specifically, Defendants failed to: (i) issue an explanation of benefits that complied with the disclosure requirements of 29 C.F.R. § 2560.503-1(g)(1); (ii) provide access to relevant plan documents or internal criteria during the appeal process, in violation of § 2560.503-1(h)(2)(iii); and (iii) conduct a full and fair review of the appeal as required by 29 U.S.C. § 1133(2) and § 2560.503-1(h)(3).

55. In the alternative, Defendants waived any exhaustion defense by failing to comply with ERISA's mandatory procedural safeguards. Their failure to issue a compliant EOB, provide relevant plan documents upon appeal, or conduct a full and fair review as required under 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(h) rendered the administrative process fundamentally defective. These violations foreclosed any meaningful opportunity to contest the denial and therefore nullify any remaining exhaustion requirement.

**G. Any Anti-Assignment Clause Is Inapplicable, Waived, or Unenforceable**

56. At all relevant times, Plaintiff held a valid written AOB executed by Patient Gin-Sho. *See Ex. 2*. During both pre-service verification calls, Defendants, acting through BSC as the Host Plan under the BlueCard® Program, never disclosed the existence of any anti-assignment provision and proceeded to engage

Complaint

with Plaintiff as the authorized billing provider. *See Ex. 3*. Furthermore,

Defendants subsequently issued a written approval letter referencing specific CPT

codes and affirmatively addressed the approval to Plaintiff, further confirming their

recognition of Plaintiff's standing as an assignee. *See Ex. 4*. Defendants accepted

Plaintiff's UB-04 claim form that expressly indicated "yes" in Box 53, reflecting

an assignment of benefits had been made. *See Ex. 6*. Although not required to

avoid waiver, Defendants did not even attempt to invoke any anti-assignment

provision in the EOB or cite it as a basis for denial. *See Ex. 7*.  As such,

Defendants either waived or are estopped from asserting any anti-assignment

clause, and/or such clause is unenforceable because the Plan's conduct

demonstrates acceptance and recognition of the assignment.

**H. Concurrent Pleading of ERISA §§ 1132(a)(1)(B) and (a)(3) Claims Is Permissible and Appropriate Under Controlling Law**

57. Clarification that ERISA plaintiffs may plead and pursue simultaneous

claims under 29 U.S.C. § 1132(a)(1)(B) and § 1132(a)(3) was definitively provided

by the U.S. Supreme Court in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), which

held that equitable remedies, such as surcharge, reformation, and estoppel, are

available under § 1132(a)(3), even where monetary relief is implicated. In

response, the Ninth Circuit in *Moyle v. Liberty Mut. Ret. Benefits Plan*, 823 F.3d

948 (9th Cir. 2016), held that ERISA plaintiffs may plead both legal and equitable

claims simultaneously, expressly disavowing pre-*Amara* precedent as "clearly irreconcilable."

58. The Ninth Circuit further emphasized that dismissal at the pleading stage is improper unless the relief sought under § 1132(a)(3) is plainly duplicative of that available under § 1132(a)(1)(B). That is a demanding standard—courts must not conflate overlap in facts with duplication in remedy. Thus, under binding Ninth Circuit law, ERISA plaintiffs may assert both statutory remedies concurrently, seeking benefits due under the terms of the plan and, where appropriate, equitable relief for fiduciary breaches Defendants committed, so long as the remedies are not truly duplicative in substance and form, which is a high bar rarely met at the pleading stage. *See Cal. Spine & Neurosurgery Inst. v. Carpenters Health & Welfare Tr. Fund*, No. 24-cv-04493-NC, slip op. at 4 (N.D. Cal. Apr. 11, 2025).

## I. Plaintiff's Claims Are Based on Defendants' Representations in the Absence of Plan Terms

59. Plaintiff does not currently possess the governing ERISA Plan document or any summary plan description. Defendants, despite exercising discretion over coverage and reimbursement decisions, failed to cite or disclose any specific Plan terms during either of the pre-service verification calls, in the written approval letter, or in the EOB. The EOB omitted applicable CPT codes, failed to define the MRC, and did not reference any reimbursement formula, cost-sharing provision, or Plan-based exclusion. *See Ex. 7.* Because Defendants affirmatively represented

coverage and reimbursement terms while omitting the controlling Plan provisions, Plaintiff reasonably relied on those representations as reflecting the terms of the Plan. Under these circumstances, Plaintiff's § 1132(a)(1)(B) claim is properly based on the Plan "as represented" by Defendants, and the absence of Plan language is a result of Defendants' failure to provide the basis for their determinations, not any pleading defect by Plaintiff.  (Plaintiff reserves the right to amend to assert additional Plan-based claims upon receipt of the operative Plan document, which Defendants failed to produce despite repeated opportunities.)

**J. Defendants' Systemic Obstruction Strategy**

60. Plaintiff has endured substantial administrative burden, stress, and obstruction simply to understand the basis for Defendants' underpayment and to obtain the reimbursement it is rightfully owed. Despite conducting two separate pre-verification calls, receiving a written approval letter, and submitting a timely appeal, Plaintiff was met with vague denial codes, no explanation of pricing methodology, and no reference to applicable Plan terms. Even now, Plaintiff is forced to bring this civil action to recover payment for medically necessary surgical services already rendered in good-faith reliance on Defendants' prior representations, and to address the harm caused by Defendants' violations of their fiduciary duties under ERISA. The time and resources expended navigating Defendants' opaque and obstructive claims process, including pre-verification

Complaint

efforts, appeal submission, and now federal litigation, are time that could otherwise be spent treating patients and fulfilling clinical responsibilities. Defendants' blanket denial or severe underpayment of every CPT code billed, despite prior verification and approval, indicates a systemic pattern of administrative fatigue and obfuscation designed to exhaust providers and deter pursuit of rightful reimbursement. This conduct inflicts heightened hardship in the healthcare industry, where high-dollar claims and procedural complexity are too often manipulated to shift financial risk onto out-of-network providers without transparency or due process.

**K. Plaintiff Seeks Attorneys' Fees and Costs Under 29 U.S.C. § 1132(g)(1)**

61. Plaintiff has been forced to initiate this action due to Defendants' wrongful denial of benefits, failure to comply with ERISA's procedural requirements, and repeated breaches of fiduciary duty. As a direct result of Defendants' misconduct, Plaintiff has incurred significant attorneys' fees and litigation costs to vindicate its rights under the ERISA Plan. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff seeks an award of reasonable attorneys' fees and costs. Such relief is appropriate in light of Defendants' systemic procedural and substantive ERISA violations and is necessary to deter future misconduct and to effectuate ERISA's remedial purposes.

///

Complaint

**L. Defendants' Procedural Violations Warrant De Novo Review**

**1. Legal Framework for Determining De Novo Review**

62. In the Ninth Circuit, courts apply a multi-step framework to determine whether de novo review or abuse of discretion applies in ERISA benefits cases. The first question is **whether the plan unambiguously grants the administrator discretionary authority to specifically determine final eligibility for benefits or construe plan terms**. General authority to administer the plan and/or pay benefits is not enough. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc). If not, then de novo review automatically applies under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), and the burden is on the plan administrator to prove that full and exclusive discretion was clearly and unequivocally granted, as confirmed in *Simkins v. NevadaCare, Inc.*, 229 F.3d 729, 733 (9th Cir. 2000).

63. If discretionary authority is established by the administrator, the court proceeds to examine **whether the administrator substantially followed ERISA's procedural safeguards**, especially those outlined in 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1. These safeguards include requirements for timely notice, clear explanations of denials, citations to plan provisions, disclosure of reimbursement methodologies, and a meaningful opportunity for review. The Department of Labor's interpretive guidance, which the Ninth Circuit considers

Complaint

persuasive, confirms that even partial payments constitute adverse benefit determinations that trigger these obligations, including full disclosure of cost-sharing terms and reimbursement methodology, as well as an opportunity for meaningful review. *See ERISA Claims Procedure Regulation: Final Rule*, 65 Fed. Reg. 70246, 70255 (Nov. 21, 2000); *FAQs About the Benefit Claims Procedure Regulation*, U.S. Dep't of Labor (2002), Q&A-7.

64. If the administrator fails to comply with any of these procedural requirements in a "wholesale and flagrant" manner, courts must disregard any discretionary authority and apply de novo review.  See *Abatie* 458 F.3d at 971–72 (en banc), reaffirmed in *Saffon v. Wells Fargo & Co.*, 522 F.3d 863, 872 (9th Cir. 2008). In reaching this holding, *Abatie* cited examples where de novo review was appropriate due to serious procedural violations: in *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1106 (9th Cir. 2003), where the administrator failed to timely decide the claim; in *Lang v. Long-Term Disability Plan for Employees of Diagnostic Specialists, Inc.*, 125 F.3d 794, 799 (9th Cir. 1997), where the administrator shifted justifications between the initial and final denial; and in *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003), where the administrator's failure to issue a final decision on an appeal warranted de novo review, with the court noting that

"deference to the administrator's expertise is inapplicable where the administrator has failed to apply his expertise to a particular decision."

65. If there is no flagrant procedural violation, the court next considers **whether the plan administrator operated under a conflict of interest.** When the same entity both evaluates or decides claims and pays benefits, this conflict does not eliminate deference but requires the court to apply abuse-of-discretion review with heightened skepticism.  This principle, established in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115–17 (2008), recognizes that an administrator's dual role as both evaluator and payor creates a financial incentive to deny benefits.  In *Abatie*, 458 F.3d at 965–69, the Ninth Circuit explained that skepticism is fact-dependent and that a conflict may justify giving little or no deference to the administrator's decision where procedural irregularities such as inconsistent explanations, failure to investigate, or other signs of bias suggest the process was "tainted."  This flexible, case-specific approach prevents discretionary review from becoming a shield for arbitrary or self-interested conduct.  *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676–77 (9th Cir. 2011) (applying abuse-of-discretion review with heightened skepticism and holding that repeated procedural violations rendered the denial arbitrary and capricious).

Complaint

66. Finally, once the appropriate standard of review is determined, the court applies it. Where de novo review applies, as it does here, the court independently evaluates whether benefits were owed, based on the administrative record and any admissible supplemental evidence. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094 (9th Cir. 1999).  Under de novo review, no deference is given to the administrator's decision; rather, the court assesses whether the plaintiff is entitled to benefits under the plan's terms.  Plan terms are interpreted as they would be understood by a person of average intelligence and experience, with ambiguities construed against the insurer. *See Simkins*, 229 F.3d at 734–35.

67. By contrast, standard abuse-of-discretion review without heightened skepticism applies only if the plan clearly grants full discretion, the administrator substantially complies with all ERISA procedural requirements and fiduciary duties, and no conflict of interest exists. Even then, under the abuse-of-discretion standard, the decision must be upheld only if it is logical, plausible, and supported by the administrative record. *See Salomaa*, 642 F.3d at 676-81 (setting forth the abuse-of-discretion standard and emphasizing that procedural irregularities remain a significant factor in its application, as deference requires a fair, reasoned, and procedurally sound decision (citing *Abatie* 458 F.3d at 974)).

///

///

## 2. Defendants' Conduct Justifies De Novo Review

68. Defendants' handling of the benefit determination in this case reflects serious procedural irregularities and supports the application of de novo review. Although the insurance card identified BCBSTX as the home plan and the approval letter confirming medical necessity was issued by BCBSTX, all benefit verification representations, pricing determinations, and the final EOB originated from BSC. The benefit quotes provided by BSC during two separate pre-verification calls were not framed as tentative host plan summaries but were presented as definitive Plan-based reimbursement terms—specifically, 60% of the MRC for the proposed CPT codes. This level of detail exceeds the ministerial role of a host plan merely "quoting" home plan terms and reflects the exercise of discretionary authority over benefit determinations. BSC later issued the EOB itself, applied inconsistent pricing, omitted CPT codes, and denied reimbursement for a previously approved service without citing any Plan exclusion or limitation. This conduct raises serious questions about which entity was responsible for administering the claim and under what authority. The ambiguity surrounding fiduciary control, combined with the failure to disclose Plan terms or provide a reasoned explanation for denial, undermines the procedural integrity of the claims process and supports de novo review. *See Abatie*, 458 F.3d at 972 (procedural irregularities justify de novo review).

Complaint

69. Under § 1133 and 29 C.F.R. § 2560.503-1, Defendants were required to provide a "specific reason or reasons for the adverse determination," cite "the specific plan provisions on which the determination is based," and describe "any internal rule, guideline, protocol, or similar criterion" relied upon. Defendants failed to satisfy each of these obligations. The denial was vague, conclusory, and unsupported by any plan-based explanation, despite specific pre-verification representations that reimbursement would be issued for each CPT code. This contradiction, paired with inconsistent administrator behavior and failure to honor procedural safeguards, constitutes a wholesale violation of ERISA's claims procedures. *Id.*; *Saffon*, 522 F.3d at 872.

70. The EOB also failed to clearly articulate any reason for denial or cite relevant Plan language, leaving both the provider and patient unable to meaningfully assess the rationale behind nonpayment. As the Ninth Circuit has emphasized, "[T]he insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence." *Simkins*, 229 F.3d at 733 (quoting *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990)).

71. Although the administrator and payor may be formally distinct entities, both BSC and BCBSTX operate under the BCBSA as regional licensees and

participate jointly in the BlueCard® Program. Their coordinated roles in the verification, adjudication, and payment process create a functional overlap that impacts each entity's financial interests. This structural conflict of interest, where one entity's benefit determination directly affects the financial liability of an affiliated entity, further warrants heightened judicial scrutiny under a de novo standard of review. *See Glenn*, 554 U.S. at 115–17; *Abatie*, 458 F.3d at 968–69. Because Defendants failed to comply with ERISA's procedural requirements, issued an internally inconsistent and unexplained denial, and operated under a structural conflict of interest, the Court should apply de novo review when evaluating Plaintiff's claims for benefits due under § 1132(a)(1)(B).

72. In the alternative, if the Court applies abuse-of-discretion review despite the procedural and fiduciary violations supporting de novo review, it must do so with heightened skepticism. BSC's dual role—verifying benefits, pricing claims, and issuing the EOB—reflects a structural conflict of interest, especially where its decisions financially benefited a related Blue entity. This conflict is compounded by serious procedural irregularities, including contradictory benefit representations, missing CPT codes, lack of Plan citations, and failure to explain pricing methodology. Together, these factors taint the integrity of the denial and preclude deference. *Id.*; *Salomaa*, 642 F.3d at 676–77.

///

Complaint

## V. COUNTS

### COUNT I
### Claim for Benefits Under 29 U.S.C. § 1132(a)(1)(B)

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

1. Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a civil action to recover benefits due under the terms of an ERISA plan.

2. Plaintiff, as the valid assignee of the patient's ERISA rights, has standing to pursue benefits owed under the Plan.

3. Defendants improperly denied and/or underpaid Plaintiff's claims for medically necessary services rendered to a covered plan participant, despite prior benefit verifications, written preauthorization, and representations regarding coverage and reimbursement terms.

4. The denial and underpayment of benefits was inconsistent with the terms of the governing Plan and constituted a violation of ERISA § 502(a)(1)(B).

5. As a result, Plaintiff is entitled to recover the unpaid benefits, together with interest, under 29 U.S.C. § 1132(a)(1)(B).

### COUNT II
### Breach of Fiduciary Duties Under 29 U.S.C. § 1132(a)(3)

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

Complaint

1. Each Defendant exercised discretionary authority over Plan administration and/or claim adjudication and thus acted as an ERISA fiduciary under 29 U.S.C. § 1002(21)(A).

2. Defendants breached their fiduciary duties of loyalty and prudence by misrepresenting coverage and reimbursement terms, failing to disclose material plan information, underpricing covered services, issuing defective EOBs, and denying Plaintiff a full and fair review of its appeal.

3. Defendants further failed to ensure compliance with ERISA's procedural requirements and did not remedy co-fiduciary breaches, as required by 29 U.S.C. §§ 1104 and 1105.

4. As a direct and proximate result of these breaches, Plaintiff suffered financial harm and was deprived of benefits to which it was entitled as the patient's assignee.

5. Plaintiff seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including but not limited to surcharge, estoppel, reformation, and an accounting of improperly withheld amounts.

6. Among other appropriate equitable remedies under 29 U.S.C. § 1132(a)(3), Plaintiff seeks to estop Defendants from denying the reimbursement terms they repeatedly represented prior to service. During two separate pre-verification calls, Defendants confirmed that out-of-network reimbursement for the

Complaint

proposed CPT codes would be issued at 60% MRC, without disclosing any alternate methodologies, Plan exclusions, or anti-assignment provisions. These representations were reaffirmed in a written approval letter. In reasonable reliance, Plaintiff performed surgery and committed substantial clinical resources. Defendants later issued a materially deficient EOB that disregarded the quoted terms and failed to explain the basis for denial. Defendants' conduct prevented Plaintiff from making an informed decision and left no opportunity to mitigate harm. This pattern of misrepresentation, reliance, and procedural failure constitutes extraordinary circumstances warranting equitable estoppel, in addition to other forms of equitable relief.

### COUNT III
### Claim for Attorneys' Fees and Costs Under 29 U.S.C. § 1132(g)(1)

Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

1. Pursuant to 29 U.S.C. § 1132(g)(1), the Court may award reasonable attorneys' fees and costs to either party in an ERISA action.

2. Defendants' conduct—including improper denial of benefits, failure to follow procedural safeguards, and breaches of fiduciary duties—necessitated this action.

3. Plaintiff has incurred and will continue to incur attorneys' fees and litigation expenses in pursuing its claims.

Complaint

4. An award of fees and costs is warranted to compensate Plaintiff, deter future violations, and promote compliance with ERISA.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vytal Surgical Institute, Inc., as the valid assignee of a participant in a self-funded ERISA Plan, respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

## A. Recovery of Benefits Due Under the ERISA Plan

Pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of monetary damages in the amount of benefits due under the terms of the applicable ERISA Plan, including payment for surgical services rendered to Patient Gin-Sho on April 15, 2021. Defendants, through their authorized representatives, expressly represented that reimbursement would be issued at 60% MRC. Defendants failed to define the MRC or provide the applicable pricing methodology, and Plaintiff reasonably understood, consistent with industry practice, that the 60% MRC rate referred to 60% of billed charges. Plaintiff rendered services in reliance on that representation and is entitled to recover the underpaid amounts accordingly.

## B. Equitable Relief to Remedy Fiduciary Breaches

Pursuant to 29 U.S.C. § 1132(a)(3), an award of appropriate equitable relief, including but not limited to:

a. **Surcharge** – monetary compensation equal to the losses caused by Defendants' fiduciary breaches, including the shortfall between the amounts paid and those reasonably expected based on the represented 60% MRC rate;

b. **Estoppel** – an order preventing Defendants from denying or recharacterizing their pre-service representations regarding coverage and reimbursement terms;

c. **Reformation** – to conform any Plan interpretation or pricing methodology to the reimbursement terms Defendants repeatedly represented and Plaintiff reasonably relied upon as the patient's assignee;

d. **Accounting** – a full and transparent accounting of all internal reimbursement calculations, pricing methodologies, and Plan provisions used to deny or reduce payment on the subject claim.

## C. Recovery of Attorneys' Fees and Costs

Pursuant to 29 U.S.C. § 1132(g)(1), an award of reasonable attorneys' fees and litigation costs incurred in connection with this action, as appropriate in light of Defendants' improper denial of benefits, fiduciary breaches, and violations of ERISA's disclosure and claims procedure requirements.

///

///

///

**D. Prejudgment and Postjudgment Interest**

An award of prejudgment interest on all unpaid or wrongfully withheld amounts at the maximum legal rate, and postjudgment interest pursuant to 28 U.S.C. § 1961 from the date of entry of judgment until full satisfaction thereof.

**E. Such Other and Further Relief as the Court Deems Just and Proper**

Any additional legal or equitable relief as the Court may find just, proper, and necessary to enforce Plaintiff's rights under ERISA and to remedy Defendants' violations.

Dated: June 30, 2025                Respectfully submitted,

**WILLIAMS HAKAKIAN LAW GROUP PC**

By:     /s/ Mina Hakakian

Mina Hakakian
Attorneys for Plaintiff,
VYTAL SURGICAL INSTITUTE, INC.